UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
                                                                     :
RICHARD W. DAUPHIN,                                                  :
                                                                     :      12-CV-2100 (ARR) (SMG)
                                       Plaintiff,                    :
                                                                     :      <u>NOT FOR ELECTRONIC</u>
                 -against-                                           :      <u>OR PRINT PUBLICATION</u>
                                                                     :
CROWNBROOK ACC LLC,                                                 :      <u>OPINION AND ORDER</u>
                                                                     :
                                       Defendant.                   :
                                                                     :
-------------------------------------------------------------------- X

ROSS, United States District Judge:

        Plaintiff Richard W. Dauphin, a former member and employee of defendant Crownbrook

ACC LLC ("Crownbrook"), brought this suit alleging that defendant had defaulted on payments

owed to him under a promissory note. Defendant brought counterclaims asserting that, when

plaintiff left defendant's employment to work for a competitor, he took documents containing

Crownbrook's confidential and proprietary information and used that information to harm

Crownbrook's business and help his new employer's business.

        In a prior order, this court granted partial summary judgment for plaintiff on his claim for

damages resulting from defendant's default on the promissory note. The court deferred entry of

judgment pending resolution of defendant's counterclaims. The parties engaged in additional

discovery, and plaintiff now moves for summary judgment on defendant's counterclaims. For the

reasons set forth below, plaintiff's motion is granted. Defendant's counterclaims are dismissed

and the court directs the entry of judgment for plaintiff in the underlying action.

# BACKGROUND

## I.     Procedural History

The following facts are undisputed and are taken from the court's prior order, Dkt. #40.
Plaintiff, a resident of Massachusetts, previously owned a membership interest in defendant, a
New York limited liability company ("LLC"), and served as its employee. On September 7,
2010, plaintiff agreed to sell his membership interest in the LLC to defendant for a purchase
price of $1.25 million. On March 26, 2011, defendant executed a promissory note agreeing to
pay $1.25 million to plaintiff in twelve quarterly installments of $104,166.66, with the first
installment due on the closing date of March 26, 2011, and the final installment due on
December 26, 2013. In the event that a payment was not made in full on the due date, the
promissory note provided that interest on the unpaid principal amount would accrue from the due
date until it was paid in full at the prime rate as published in the Wall Street Journal. Also on
March 26, 2011, the parties terminated plaintiff's prior employment agreement with defendant
and entered into a new employment agreement.

Defendant made the first three payments under the promissory note but did not pay the
fourth installment due on December 26, 2011. In February 2012, plaintiff terminated his
employment with defendant. Defendant has not made any further payments on the note.

On April 30, 2012, plaintiff filed this diversity suit seeking damages for the unpaid
installments on the promissory note, including interest. Compl., Dkt. #1. Defendant asserted
several affirmative defenses and counterclaims. Am. Answer & Countercl., Dkt. #13. On April
11, 2013, the court granted partial summary judgment for plaintiff, finding that the record did not
support defendant's affirmative defenses. Dkt. #40.

At issue now are defendant's counterclaims. Defendant alleges that on or about February

10, 2012, plaintiff resigned his employment with defendant and took a job with defendant's direct competitor, Dairy Conveyor Corp. ("Dairy Conveyor"). Am. Answer & Countercl. ¶ 34. Defendant alleges that plaintiff took a laptop containing "reams of Crownbrook's confidential and proprietary information," including financial data, business plans, product information, customer lists, and marketing plans, and has refused to return the information. Id. ¶¶ 34-35. Defendant further alleges that plaintiff disclosed this confidential and proprietary information to his new employer and used the information at his new job "to compete with Crownbrook and steal Crownbrook's customers and business relations." Id. ¶¶ 35-36.

Defendant asserts five counterclaims against plaintiff: (1) breach of contract; (2) misappropriation of trade secrets and confidential business information; (3) breach of fiduciary duty; (4) conversion; and (5) unfair competition. Id. ¶¶ 38-62. As remedies, defendant seeks dismissal of the claims in plaintiff's complaint; an injunction requiring plaintiff to return "all documents, data, materials, processes, and procedures taken from Crownbrook or derived from Crownbrook's materials"; compensatory and punitive damages; and attorney's fees and costs.

## II. Evidence Regarding Defendant's Counterclaims

Having reviewed the deposition testimony, affidavits, and other exhibits submitted by the parties, the court will summarize the evidence in the record regarding defendant's counterclaims.

### A. Taking of Defendant's Confidential Information

It is undisputed that when plaintiff left his employment at Crownbrook, he kept a laptop computer that had been provided to him by defendant. Plaintiff asserts that he "felt justified" in keeping the laptop because defendant had stopped making the payments owed to him on the promissory note. Aff. of Richard W. Dauphin ("Pl. Aff."), Dkt. #73, Ex. 1, ¶ 9. In his deposition,

plaintiff testified that a few weeks after he left Crownbrook, the company asked for the laptop back, but he did not return it because defendant owed him money. Dep. of Richard W. Dauphin ("Pl. Dep."), Dkt. #76, Ex. 1, at 171.

Defendant asserts that plaintiff also retained confidential and proprietary documents belonging to Crownbrook. In support of this allegation, defendant has provided an expert report by Sal Llanera, a certified fraud examiner and consultant in computer forensics. Expert Report of Sal Llanera ("Llanera Report"), Dkt. #78, Ex. 1. Llanera's report identifies two bases for alleging that plaintiff retained Crownbrook's confidential documents after leaving his position there.

First, Llanera conducted a search of plaintiff's Crownbrook e-mail account and identified seven e-mails that were sent from plaintiff's account to his wife's account. Id. ¶ 13. Levi Krinsky, the president of Crownbrook, asserts that these e-mails included attachments with confidential information. Aff. of Levi Krinsky ("Krinsky Aff."), Dkt. #77, ¶ 6. Among these attachments was a "pipline document," which Krinsky describes as "basically a summary of all of Defendant's business up until that point, and included, among other highly sensitive and proprietary information, Defendant's pricing information, identification of its then current and prospective customers as well as all of its outstanding projects and bids." Id. ¶ 7. Krinsky asserts that "[n]o one in Defendant's employ, other than Plaintiff, emailed those documents from Plaintiff's mailbox at Defendant's domain to Plaintiff's wife's email address." Id. ¶ 6.

Second, Llanera conducted an investigation of the laptop that plaintiff retained after leaving Crownbrook and identified 5,117 files that were last accessed on February 24, 2012, several weeks after plaintiff left Crownbrook's employment. Llanera Report ¶ 14.[1] Llanera states "with a reasonable degree of certainty" that the files were all copied at the same time from the

---

[1] The record does not establish when plaintiff returned the laptop to Crownbrook. However, he must have returned it sometime before June 6, 2013, when Llanera conducted a forensic analysis of the laptop. Llanera Report ¶ 9.

laptop to an external hard drive. Id. ¶ 20.[2] Krinsky, Crownbrook's president, asserts that these files contained confidential information including drawings, pricing information, customer lists, internal salary information, and draft and final proposals. Krinsky Aff. ¶ 11. Based on his investigation, Llanera states that it is his opinion "that confidential and proprietary information stored in the laptop I analyzed were sent and copied to computers and devices not controlled and/or authorized by the Defendant." Llanera Report ¶ 25.

Plaintiff denies e-mailing Crownbrook documents to his wife's account or copying Crownbrook's files from the laptop. Pl. Aff. ¶ 9. In his deposition, plaintiff testified that he did not know why e-mails were forwarded from his work account to his wife's account and did not remember whether he accessed the documents attached to the e-mails. Pl. Dep. 152-54. In his later affidavit, plaintiff states: "I believe that while I was ill, emails with information attached were sent to me by someone in the office with access to the Laptop, via my wife's email account." Pl. Aff. ¶ 9. Plaintiff testified in his deposition that he downloaded some documents from the laptop to a thumb drive, but only files from his attorney and some "personal stuff." Pl. Dep. 205-07. He denied copying the company's drawings from the laptop to a thumb drive. Id. at 207. He stated that after he left defendant's employment in February 2012, he kept the laptop at his home. Id. at 206. Plaintiff testified that he would get calls from former colleagues "out in the field on jobs they were doing," and he would turn on the laptop and look at documents in order to answer their questions. Id. at 172-73. Plaintiff testified that no one else had access to the laptop after he left Crownbrook, other than his son-in-law who borrowed the laptop at one point when his own computer stopped working. Id. at 201-03.

---

[2] Llanera's report states that a pattern of numerous files all having the same last date of access "is indicative of either a mass copy, a backup process that took place or a full anti-virus scan of the laptop." Llanera Report ¶ 14. Llanera found no indication that an anti-virus scan or back-up process had occurred on February 24, 2012. Id. ¶¶ 16-19. His analysis also showed that a USB external hard drive had been plugged into the laptop on February 24, 2012, a few minutes before the time of last access shown on the files. Id. ¶ 24.

### B.     Use and Disclosure of Defendant's Confidential Information

Defendant further asserts that plaintiff disclosed Crownbrook's confidential information to his new employer at Dairy Conveyor and used the information to harm Crownbrook's business. In support of this allegation, defendant asserts that Crownbrook has lost significant business to Dairy Conveyor since plaintiff's departure.

Krinsky, Crownbrook's president, testified in his deposition that Crownbrook's business had been "affected in a way that has been highly detrimental" since plaintiff left. Dep. of Levi Krinsky ("Krinsky Dep."), Dkt. #73, Ex. 5, at 11. Krinsky stated that, since plaintiff's departure, Crownbrook had been awarded almost no projects in the dairy industry, "which prior was the base of our business." Id. at 15. At his deposition, Krinsky could not identify particular projects for which Crownbrook did not have the opportunity to submit a bid, nor could Krinsky identify a project that plaintiff had initially quoted for Crownbrook and then later got for Dairy Conveyor. Id. at 25-26, 37.

In a later affidavit, Krinsky asserts that Crownbrook has lost "nearly $5 million in sales" since plaintiff left, including "nearly all of the dairy industry business that Defendant had prior to Plaintiff's departure." Krinsky Aff. ¶ 8. Specifically, Krinsky identifies three projects, together accounting for $600,000 in expected sales: the N8 Conveyor project for Country Pure Foods, the Side Grip Elevator project for Country Pure Foods, and the Half Gallon Corrugated Line project for Garelick Lynn. Id. Krinsky states that plaintiff worked on all three of these projects while he was employed by Crownbrook, that information about these three projects was included in the confidential documents on the laptop, and that Crownbrook "had a reasonable expectation of being awarded these jobs." Id. Krinsky's affidavit also identifies other specific projects that Crownbrook had a "reasonable expectation" of being awarded. Id. ¶¶ 9-10.

In his deposition, Krinsky testified that Crownbrook's salespeople attributed the loss of business to "competition from [plaintiff] and Dairy Conveyor." Krinsky Dep. 31-33. Krinsky stated that one of Crownbrook's salespeople told Krinsky that he was "given the understanding that because of Mr. Dauphin he was not being invited to quote." Id. at 22. Krinsky asserted that he believed plaintiff was using Crownbrook's confidential information to attract Crownbrook's customers to Dairy Conveyor: "Our sales have been affected in a way which I can't explain any other than there has been unfair practices on the part of Dairy Conveyor having perhaps information on our pricing and also being, also with regard to our contacts, which I believe was through the efforts of Mr. Dauphin." Id. at 16.

On multiple occasions in the deposition, however, Krinsky testified that he had no direct evidence that plaintiff disclosed Crownbrook's confidential information to Dairy Conveyor or used the information at Dairy Conveyor:

> Q:    Do you have any evidence that Dauphin disclosed any of your confidential or proprietary information to his new employer?
> A:    No.
> Q:    Do you have any evidence that Dauphin used your confidential or proprietary information for his new employer's benefit?
> A:    Not directly.

Id. at 25; see also id. at 11, 18, 26, 50. When plaintiff's counsel asked Krinsky, "Have the [Crownbrook] salesmen told you that the customers have told them that Dauphin has done something of what you have alleged and that is the reason they are not going to give you an order," Krinsky responded, "Not that way." Id. at 50. He stated that the Crownbrook salespeople reported "more difficulty working with our customers" and "increased competition from Dairy Conveyor." Id. at 50-51.

For his part, plaintiff "categorically den[ies]" disclosing any of defendant's confidential

information to Dairy Conveyor or using such information "for any purpose after [he] quit Defendant's employ." Pl's Aff. ¶ 8. Gary Freudenberg, the president of Dairy Conveyor, testified in a deposition that he was not aware that plaintiff took defendant's laptop when he left Crownbrook and went to work at Dairy Conveyor. Dep. of Gary Freudenberg ("Freudenberg Dep."), Dkt. #73, Ex. 9, at 67. Freudenberg also testified that he had never heard of the "sales pipeline" document from Crownbrook. Id. at 105. Freudenberg testified that Dairy Conveyor hired plaintiff based on his experience and the fact that he had worked for Dairy Conveyor before. Id. He testified that Dairy Conveyor did not hire plaintiff to gain access to his customer base from Crownbrook, and Freudenberg could not think of any new customers that plaintiff had brought to Dairy Conveyor since he started working there. Id. at 105-107.

Freudenberg also testified that plaintiff could not have used Crownbrook documents to generate price quotes for Dairy Conveyor customers. He stated that Dairy Conveyor has a "proprietary pricing program" that all of its staff use to generate quotes for projects. Id. at 37-38. Freudenberg stated that he instructed plaintiff to use that program for all projects. Id. at 37. Once Dairy Conveyor's program generates a price quote, only two people have authority to change the quote: Freudenberg and his partner Tony Gomez. Id. at 38-39. Therefore, Freudenberg testified that no staff member can discount a quote unless Freudenberg or Gomez approves it. Id. at 42.

At the deposition, defendant's counsel asked Freudenberg about the specific projects referenced in Krinsky's affidavit as projects that Crownbrook had lost to Dairy Conveyor. Regarding the Country Pure Foods's projects, Freudenberg stated that plaintiff's role was to go on site to take measurements and then send that information to other staff members to create drawings. Id. at 30-31. Plaintiff used Dairy Conveyor's proprietary pricing software to generate a bid, and Country Pure Foods was quoted the list price as generated by the program. Id. at 42-43.

Freudenberg stated that he was not aware that plaintiff had been involved in generating bids for Country Pure Foods when he worked at Crownbrook. Id. at 65. When asked whether plaintiff had used any Crownbrook documents when he constructed Dairy Conveyor's bids for Country Pure, Freudenberg responded, "I know that he didn't . . . [b]ecause I wouldn't allow that, any materials that are not ours." Id. at 66. He stated, "[A]ny quotations that Dairy Conveyor provides to a client would be off of our drawings, field dimension by our employees, then put into our pricing program on quoting and generating a Dairy Conveyor quotation." Id.

Regarding the Half Gallon Corrugated Line project for Garelick Lynn, Freudenberg testified that plaintiff took field dimensions and relayed them to Freudenberg so that Freudenberg could update Dairy Conveyor's drawings. Id. at 92-93. Plaintiff then generated a price quote using Dairy Conveyor's proprietary program. Id. at 96. Freudenberg testified that plaintiff did not consult any other documents regarding the project design because Dairy Conveyor used its own drawings. Id. He testified that, to his knowledge, plaintiff did not consult any other documents to generate the price quote, and "[i]t would have no bearing anyway" because Dairy Conveyor used the price generated by its proprietary program. Id. at 96-97.

Defendant's counsel also asked Freudenberg about numerous other specific projects. For each one, Freudenberg testified that plaintiff had no involvement in either Dairy Conveyor's bid on the project or its decision not to bid on the project. Id. at 78-79, 81-92, 100-102.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The function of the court is not to resolve disputed factual issues but to determine

whether there is a genuine issue to be tried. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "While genuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (quoting Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)) (internal quotation marks and ellipses omitted).

In assessing whether summary judgment is appropriate, the court considers "the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011) (quoting In re Bennett Funding Grp., Inc., 336 F.3d 94, 99 (2d Cir. 2003)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party carries the burden of proving that there is no genuine dispute respecting any material fact and "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994). Once this burden is met, in order to avoid the entry of summary judgment, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." LaBounty v. Coughlin, 137 F.3d 68, 73 (2d Cir. 1998). In reviewing the record before it, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

# DISCUSSION

## I.    Breach of Contract

The first counterclaim alleges that plaintiff breached the confidentiality provisions of his employment agreement with defendant by removing confidential and proprietary information from defendant, disclosing it to his new employer, using it for his new employer's benefit and defendant's detriment, and failing to return it to defendant. Am. Answer & Countercl. ¶ 40.

Under New York law, "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." In re Delta Airlines, 608 F.3d 139, 146 (2d Cir. 2010) (alteration in original) (quoting Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170 (N.Y. 2002)). Since the best evidence of the parties' intent is the terms set out in writing, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Greenfield, 780 N.E.2d at 170. The issue of whether the contract language is ambiguous or clear is a matter of law to be determined by the court. Fed. Ins. Co. v. Am. Home Assurance Co., 639 F.3d 557, 568 (2d Cir. 2011).

Here, the contractual provision at issue is the confidentiality clause of plaintiff's March 26, 2011, employment agreement with defendant. The relevant section, which refers to plaintiff as "Executive" and defendant as "Company," provides as follows:

> Executive shall not, without the prior written consent of the Company, use, divulge, disclose or make accessible to any other person, firm, partnership, corporation or other entity any Confidential Information (as defined below) pertaining to the business of the Company or any of its affiliates, except (i) while employed by the Company, in the business of and for the benefit of the Company, or (ii) when required to do so by a court of competent jurisdiction, by any governmental agency having supervisory authority over the business of the Company, or by any administrative body or legislative body (including a committee thereof) with jurisdiction to order Executive to divulge, disclose or make accessible such information.

Krinsky Aff., Ex. 1, at ECF 19. The agreement defines "Confidential Information" as "non-public information concerning the financial data, strategic business plans, product development (or other proprietary product data), customer lists, marketing plans and other non-public, proprietary and confidential information of the Company or its affiliates . . . or customers." Id.

I find as a matter of law that defendant can prevail on a breach of contract claim only by proving that plaintiff used defendant's confidential information or disclosed it to another person or company. According to the plain language of the confidentiality provision, plaintiff shall not "use, divulge, disclose or make accessible" the information. Mere possession or retention of defendant's confidential information, without more, would not fall within the scope of this clause, since the contract unambiguously prohibits only use or disclosure.

Therefore, while the record reflects a dispute about whether plaintiff retained files containing defendant's confidential information after he left Crownbrook, this dispute is not material. There is simply no evidence that plaintiff used or disclosed defendant's confidential information, which defendant would have to establish in order to succeed on a breach of contract claim. Read in the light most favorable to defendant, the record suggests that Crownbrook lost out on business opportunities after plaintiff left to work for Dairy Conveyor, and Crownbrook's salespeople reported that plaintiff was attracting their former customers to Dairy Conveyor. Yet all this proves is that Crownbrook and Dairy Conveyor are competitors, which no one disputes. Crownbrook cannot point to any evidence that plaintiff attracted customers to Dairy Conveyor by using Crownbrook's confidential information. Indeed, Krinsky conceded multiple times in his deposition that he has no direct evidence of plaintiff's use or disclosure of Crownbrook's confidential information.

Defendant instead argues that the court should rely on connections that can be drawn

"circumstantially" from the available evidence. Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. ("Opp'n"), Dkt. #74, at 7. Defendant asserts that the record establishes the following triable issues of fact: (1) that plaintiff retained Crownbrook's confidential and proprietary information when he started work at Dairy Conveyor; (2) that plaintiff worked on jobs at Dairy Conveyor on which he had previously worked at Crownbrook; (3) that plaintiff "had or knew confidential and proprietary details of Defendant's bids while he was assisting Dairy Conveyor to bid against them"; and (4) that Crownbrook "lost bids totaling nearly $1 million to Dairy Conveyor which Plaintiff had worked on while at Defendant." Id. at 8. Defendant argues that, in the absence of direct evidence that plaintiff used or disclosed Crownbrook's confidential information, these propositions taken together should be sufficient to defeat a motion for summary judgment. [3]

Yet defendant asks the court to make too great an inferential leap. Defendant relies on the speculative argument that Crownbrook's loss of business must have been due to plaintiff's use of its confidential information to undercut its bids. This assertion is not only unsupported by any evidence in the record but is also contradicted by other evidence. First, Krinsky conceded that Dairy Conveyor is bigger than Crownbrook, is older than Crownbrook, has "likely" installed more equipment over time than Crownbrook, and "possibly" has technical expertise greater than Crownbrook. Krinsky Dep. at 43. Therefore, Krinsky's own testimony suggests other possible reasons why customers may have chosen Dairy Conveyor over Crownbrook. Second, the testimony of Freudenberg, the president of Dairy Conveyor, rebuts the contention that plaintiff used Crownbrook's confidential documents in his work for his new employer. Freudenberg

---

[3] Defendant's brief also asserts that plaintiff's retention of the laptop "is, in and of itself, a violation of the confidentiality clause." Opp'n 7. Defendant offers no support for this assertion, and the plain language of the confidentiality clause provides no basis to conclude that retaining the laptop, without more, would constitute a breach of the employment agreement.

testified that plaintiff used Dairy Conveyor's proprietary pricing program to generate bids for customers and would not have authority to change the price generated by the program. For all of the specific projects that Krinsky cited in his affidavit as projects that Crownbrook lost to Dairy Conveyor, Freudenberg described plaintiff's role in the bidding process and explained that plaintiff used Dairy Conveyor's own drawings and pricing program.

Defendant's unsubstantiated allegations that plaintiff used and disclosed Crownbrook's confidential information are insufficient to create a triable issue of fact, especially where the record provides ample evidence to rebut defendant's allegations. Since defendant can only succeed on a breach of contract claim by proving that plaintiff used or disclosed Crownbrook's confidential information, and since defendant cannot point to any evidence in the record of plaintiff's use or disclosure of such information, plaintiff is entitled to summary judgment dismissing this counterclaim.

## II.     Misappropriation of Trade Secrets and Confidential Business Information

The second counterclaim alleges that plaintiff misappropriated defendant's trade secrets and confidential business information, including customer lists, supplier lists, pricing information, and financial information, and is improperly using this information for his own commercial benefit. Am. Answer & Countercl. ¶¶ 44-46.

To state a claim for misappropriation of trade secrets under New York law, defendant must demonstrate "(1) that it possessed a trade secret, and (2) that [plaintiff] used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 117 (2d Cir. 2009) (quoting N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 43-44 (2d Cir. 1999)). A trade

secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc., 118 F.3d 955, 968 (2d Cir. 1997) (quoting Restatement of Torts § 757 cmt. b, at 5 (1939)).

The parties have not addressed whether the documents that plaintiff allegedly retained from Crownbrook constitute trade secrets. Courts applying New York law have held that the type of information at issue here, including customer lists and pricing information, can be protected trade secrets. See N. Atl. Instruments, 188 F.3d at 46 (information regarding a company's client contacts constitutes a protected trade secret if "it would be difficult to duplicate a customer list because it reflected individual customer preferences"); B.U.S.A. Corp. v. Ecogloves, Inc., No. 05 CIV. 9988(SCR), 2006 WL 3302841, at *3 (S.D.N.Y. Jan. 31, 2006) (holding that a company's "cost structures and bidding information" are a trade secret); Unisource Worldwide, Inc. v. Valenti, 196 F. Supp. 2d 269, 278 (E.D.N.Y. 2002) ("[K]nowledge of a customer's needs and specifications and the prices charged to that customer are considered confidential.").

However, even if defendant could satisfy the first prong of a misappropriation of trade secrets claim by showing that the documents at issue contained trade secrets, defendant must still satisfy the second prong and demonstrate that plaintiff used that information in breach of an agreement or duty. Courts in this Circuit have allowed claims for misappropriation of trade secrets to go forward where companies had evidence that a former employee used or disclosed trade secrets. In North Atlantic Instruments v. Haber, a printout of confidential client information from Haber's former employer was found in his new employer's files, and Haber had been "calling the client contacts he had used and developed while at [his former employer] and asking that they leave [his former employer] to do business with [his new employer]." 188 F.3d at 42.

The Second Circuit upheld a preliminary injunction against Haber prohibiting him from using the client information, noting the "unrefuted evidence that Haber printed <u>and used</u> information" from his former employer's client database. <u>Id.</u> at 47 (emphasis added); <u>see also</u> <u>Poller v. Bioscrip, Inc.</u>, No. 11 Civ. 1675(JPO), 2013 WL 5354753, at *18 (S.D.N.Y. Sept. 25, 2013) (denying summary judgment on misappropriation of trade secrets claim because "the record does suggest that Poller intended to utilize the information to some extent in her new capacity" at her new employer).

Here, as discussed above, defendant can point to no evidence in the record to show that plaintiff used or disclosed Crownbrook's confidential information. Moreover, plaintiff submitted an affidavit denying that he used Crownbrook's information at his new job, and the president of Dairy Conveyor testified that plaintiff did not use Crownbrook's confidential information to generate price quotes for customers. Courts have granted summary judgment dismissing misappropriation of trade secret claims where, as here, a company has no evidence that a former employee used its confidential information. For example, in <u>Delville v. Firmenich, Inc.</u>, 920 F. Supp. 2d 446 (S.D.N.Y. 2013), a perfume company asserted that a former employee "destroyed and discarded perfume samples and removed paper files containing perfume formulas from his office." <u>Id.</u> at 455. The court granted summary judgment dismissing the company's misappropriation of trade secrets claim, finding that, even if the company could prove the former employee took the formulas, the company "admittedly proffered <u>no</u> evidence" that the former employee used its confidential or proprietary information to solicit clients or benefit his new employer. <u>Id.</u> at 470; <u>see also</u> <u>Indotronix Int'l Corp. v. Ayyala</u>, 888 N.Y.S.2d 170, 171 (App Div. 2009) (granting summary judgment where employee submitted evidence demonstrating he did not disclose any confidential or proprietary information and company's "unsubstantiated

assertions and speculation submitted . . . in opposition were insufficient to raise a triable issue of fact"); Manculich v. Dependable Auto Sales & Serv., Inc., 833 N.Y.S.2d 767, 768 (App. Div. 2007) (granting summary judgment where employee and her new employer submitted affidavits asserting that she never used company's confidential customer lists and business strategies to generate business for her new employer).

Accordingly, plaintiff is entitled to summary judgment dismissing this counterclaim.

**III.     Breach of Fiduciary Duty**

The third counterclaim alleges that plaintiff owed a fiduciary duty to Crownbrook as a former member, officer, and employee, and that plaintiff breached this fiduciary duty by "stealing . . . and using" Crownbrook's confidential information for the financial benefit of plaintiff and his new employer, Dairy Conveyor. Am. Answer & Countercl. ¶¶ 49-50.

"Under New York law, an employee owes a duty of good faith and loyalty to his employer." Design Strategies, Inc. v. Davis, 384 F. Supp. 2d 649, 659 (S.D.N.Y. 2005), aff'd, 469 F.3d 284 (2d Cir. 2006)). The employee's fiduciary duty to the employer "may continue after termination of the employment relationship." Am. Fed. Grp., Ltd. v. Rothenberg, 136 F.3d 897, 914 (2d Cir. 1998). "Such a continuing duty may, in appropriate circumstances, include the specific duty not to divert business in which a former employer has the requisite tangible expectancy, and the duty not to exploit to the former employer's detriment specific information obtained during the employment that was either technically confidential or that was available to the fiduciary only because of the employment." Id. (internal citation and quotation marks omitted). Moreover, the Second Circuit has suggested that soliciting a former employer's customers using information that was taken or copied from the former employer could constitute

"an egregious breach of trust and confidence." <u>N. Atl. Instruments</u>, 188 F.3d at 47 (quoting <u>Leo Silfen, Inc. v. Cream</u>, 278 N.E.2d 636, 639 (N.Y. 1972)).

Even assuming that plaintiff owes a continuing duty to Crownbrook as a former employee, there is no evidence that he breached this duty. For the reasons discussed above, defendant cannot point to evidence that plaintiff used confidential information gained from Crownbrook in order to solicit customers for Dairy Conveyor and harm his former employer's business. Therefore, plaintiff is entitled to summary judgment dismissing this counterclaim. <u>See Delville,</u> 920 F. Supp. 2d at 471 (granting summary judgment dismissing breach of fiduciary duty claim as duplicative of other claims and based on lack of evidence that former employee used company's documents to enrich himself and his new employer).

## IV. Conversion

The fourth counterclaim alleges that plaintiff "intentionally and without authority exercised control over confidential and proprietary information belonging to Crownbrook and wrongfully interfered with Crownbrook's right of possession by taking (and not returning despite a request to do so) the confidential and proprietary information" from defendant's laptop. Am. Answer & Countercl. ¶ 55. Defendant alleges that plaintiff's "intentional taking of the computer for his own benefit, thereby depriving Crownbrook of the use of the confidential and proprietary information on that computer, constitutes a conversion of Crownbrook's assets." <u>Id.</u> ¶ 56.

To establish a claim of conversion, defendant "must show legal ownership or an immediate superior right of possession to a specific identifiable thing and must show that [plaintiff] exercised an unauthorized dominion over the thing in question . . . to the exclusion of [defendant's] rights." <u>Berman v. Sugo LLC</u>, 580 F. Supp. 2d 191, 206 (S.D.N.Y. 2008) (quoting

Fiorenti v. Cent. Emergency Physicians, PLLC, 762 N.Y.S.2d 402 (App. Div. 2003)). New York law does not recognize a claim for conversion of intangible property, so a claim cannot succeed for conversion of "good will or any intangible assets." Id. Yet electronic records that are stored on a computer and "indistinguishable from printed documents" can form the basis of a conversion claim. Thyroff v. Nationwide Mut. Ins. Co., 864 N.E.2d 1272, 1278 (N.Y. 2007).

Here, defendant does not appear to be asserting a claim for conversion of the laptop itself. Instead, the counterclaim asserts that plaintiff converted Crownbrook's "confidential and proprietary information" from the laptop. While defendant cannot bring a conversion claim regarding intangible property, defendant could assert a claim regarding the electronic files that plaintiff allegedly copied from the laptop. However, defendant fails to establish how plaintiff's copying of those files, even if proven, would interfere with defendant's possession of the files. Defendant has nowhere alleged, and the record nowhere suggests, that plaintiff retained defendant's sole copy of the files. Instead, the counterclaims assert that plaintiff made a copy of the files for himself and used the files at his new job, but such copying and use would not deprive defendant of the use of the files. Therefore, since defendant cannot establish an essential element of a conversion claim, plaintiff is entitled to summary judgment dismissing this counterclaim. See Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp LLC, 813 F. Supp. 2d 489, 536 (S.D.N.Y. 2011) (dismissing conversion claim against former employee who accessed company's client list and downloaded it onto thumb drive because he "possessed only a copy of the client list and did not, in any way, limit or otherwise deprive [the company] of possession or use of that list."); cf. Madden v. Creative Servs., Inc., 872 F. Supp. 1205, 1210 (W.D.N.Y. 1993) (dismissing conversion claim where defendants allegedly read and photographed documents from plaintiffs' attorney's office because "[d]efendants . . . did nothing

to deprive plaintiff of their right to possess their documents, which were in [the attorney's] office at all times.").

## V.     Unfair Competition

Finally, the fifth counterclaim alleges that plaintiff acted in bad faith by using confidential and proprietary business information that he stole from defendant, and that this misappropriation of defendant's trade secrets constitutes unfair competition. Am. Answer & Countercl. ¶¶ 60-61.

"The central principle underlying a claim for unfair competition under New York law is that one may not misappropriate the results of the labor, skill, and expenditures of another." LinkCo., Inc. v. Fujitsu, Ltd., 230 F. Supp. 2d 492, 500 (S.D.N.Y. 2002) (citing Saratoga Vichy Spring Co., Inc. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980)). Defendant must prove that plaintiff "misappropriated the fruit of [defendant's] labors and expenditures by obtaining access to [defendant's] business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship." Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 197 (2d Cir. 2001). While New York's law of unfair competition is a "broad and flexible doctrine," it still requires "the allegation of facts that, if true, would constitute misuse of [defendant's] property." Dow Jones & Co., Inc. v. Int'l Sec. Exch., Inc., 451 F.3d 295, 302 n.8 (2d Cir. 2006) (internal quotation marks omitted). "[I]t is well established that, where an unfair competition claim and a misappropriation claim arise from the same factual predicate . . . the two claims generally rise or fall together." Faiveley Transp. USA, Inc. v. Wabtec Corp., No. 10 Civ. 4062(JSR), 2011 WL 1899730, at *9 (S.D.N.Y. May 13, 2011) (internal quotation marks omitted).

In this case, where defendant's claim for misappropriation of trade secrets must be

dismissed due to a lack of evidence that plaintiff used Crownbrook's confidential information, defendant's unfair competition claim must likewise fail for the same reason. See Delville, 920 F. Supp. 2d at 471 (granting summary judgment dismissing unfair competition claim where record showed no evidence that employee misused company's property in a competitive setting).

## VI.     Defendant's Request for Additional Discovery

Defendant argues that, before deciding the motion for summary judgment, the court should permit defendant to conduct discovery of customers who gave their business to Dairy Conveyor rather than Crownbrook. Defendant seeks to conduct this discovery "to determine the extent of plaintiff's involvement in gaining their business for Dairy Conveyor, to what extent Defendant would have been awarded the business absent Plaintiff's conduct and, most importantly, to find out what, if any, information was used by Plaintiff or transmitted to the customer in the course of their communications." Opp'n 9.

The court has already addressed this discovery request. On September 25, 2013, defendant brought a motion before the Honorable Steven M. Gold, United States Magistrate Judge, to conduct third party discovery of plaintiff's new employer and of several of defendant's former customers. Dkt. #56. At a conference on September 30, 2013, Judge Gold permitted a limited deposition of Dairy Conveyor's president but ruled there was not a good faith basis to permit third-party discovery of defendant's former customers. Dkt. #58. Judge Gold gave defendant the opportunity to renew the request to expand the discovery to former customers if a good faith basis emerged from the deposition of Dairy Conveyor's president. Defendant conducted the deposition of Freudenberg on December 12, 2013, but did not renew the request to Judge Gold. Nor did defendant appeal Judge Gold's discovery order.

Instead, on December 30, 3013, after plaintiff sought leave to bring a motion for summary judgment, defendant asked this court to allow discovery of its former customers. Dkt. #70. In an order on January 10, 2014, I denied the request, finding no reason to alter Judge Gold's ruling. Dkt. #71. I found that defendant had failed to show that Crownbrook's former customers would have relevant information on how Dairy Conveyor acquired their business. Therefore, I found that any speculative benefits of the requested discovery would not outweigh the significant burden on the third party customers and on plaintiff's ongoing business relationship with these customers.

Nothing in the record alters this conclusion. Plaintiff initially brought this case over two years ago, and defendant has had ample time to conduct discovery, including depositions of plaintiff and of his current employer. Nothing in Freudenberg's deposition provides a good faith basis to expand discovery to Crownbrook's former customers. Accordingly, the request for additional discovery is denied.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted and defendant's counterclaims are dismissed. Pursuant to the court's prior order of April 10, 2013, the court directs entry of judgment for plaintiff in the underlying action.

SO ORDERED.

\_\_/s/_____
Allyne R. Ross
United States District Judge

Dated:       May 15, 2014
             Brooklyn, New York